STEPHEN L. COHEN
J. LEE BUCK, II, D.C. Bar No. 421878
ALFRED C. TIERNEY
JOHN P. LUCAS

Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, DC 20549
Telephone: (202) 551 - 4500
Fascimile: (202) 772 - 9189

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALFIORNIA

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

BILL C. (BILLY) CRAFTON, JR.,

Defendant.

Case No. '14CV2916 DMS JLB

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") alleges as follows:

## SUMMARY OF ALLEGATIONS

1. This action concerns Defendant Bill C. (Billy) Crafton, Jr.'s fraudulent misconduct in connection with investment advisory services Crafton provided to his advisory clients.

///

2. From at least 2006 through at least 2011, while acting as an investment advisor and unregistered broker, Crafton knowingly misrepresented or failed to disclose to his advisory clients the fact that he received over $1.5 million in compensation in connection with certain investments and financial services Crafton recommended to those clients.

3. In addition, in or about June 2010, while acting as an investment advisor, and while associated with an investment advisor registered with the Commission, Crafton knowingly perpetrated a scheme to defraud two of his advisory clients by directing the misappropriation of $700,000 from them for the benefit of a third client by using the funds to redeem, and assign to them, the third client's investment in a private illiquid fund, which only days prior to the misappropriation – and as Crafton well knew – had been the subject of an emergency action filed by the Commission, in which a freeze of the fund's assets was ordered based on allegations the fund was being operated as a Ponzi-like scheme.

4. Crafton has violated and, unless enjoined, will continue to violate the antifraud and broker-dealer registration provisions of the federal securities laws. Accordingly, the Commission seeks permanent injunctions against Crafton, as well as the disgorgement of ill-gotten gains and the imposition of a civil penalty.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(l) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(l) and 77v(a)]; Sections 21(d)(l), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) and 78aa]; and Sections 209 and 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9 and 80b-14].

6. Crafton has, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a

national securities exchange, in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

7. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-14] because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this District; Crafton resides in this District; and a substantial portion of the conduct alleged in this complaint occurred within this District.

## DEFENDANT

8. **Bill C. (Billy) Crafton**, age 38, is, and at all relevant times was, a resident of San Diego, California. Since 1999, Crafton has provided investment advisory and business management services primarily to professional athletes. Crafton was the CEO and 100% owner of Martin Kelly Capital Management, LLC ("Martin Kelly Capital"), an investment adviser registered with the Commission, from approximately June 2006 to December 2009 and then again from December 2012 through the present.

## FACTUAL ALLEGATIONS

### Crafton's Background

9. In approximately May 2006, Crafton founded Martin Kelly Capital. Martin Kelly Capital was an investment adviser registered with the Commission from approximately 2006 through December 2012. From approximately 2006 through November 2009, Crafton maintained 100% ownership and control of Martin Kelly Capital, and was solely responsible for providing investment advice to clients. From 2006 through approximately March 2010, Crafton was also a registered investment adviser representative of Martin Kelly Capital. From 2006 through November 2009, Crafton's number of advisory clients and assets under management at Martin Kelly Capital grew from approximately 17 advisory clients

3

with approximately $26 million in assets under management to approximately 50 advisory clients with over $110 million in assets under management.

10. Crafton's advisory clients consisted primarily of present and former professional athletes in Major League Baseball, the National Football League, the National Hockey League, the National Basketball Association, and other professional sports leagues.

11. In approximately November 2009, Crafton sold his advisory client relationships to Investment Advisory Firm A, which contemporaneously hired Crafton and at least two of Crafton's employees from Martin Kelly Capital. From approximately December 2009 through September 2010, Crafton was associated with Investment Advisory Firm A where he was employed as an investment advisor and continued to provide investment advisory services to his clients. In September 2010, Investment Advisory Firm A terminated its association with and employment of Crafton. At all times during the relevant period, Investment Advisory Firm A was an investment advisor registered with the Commission.

12. From approximately September 2010 through at least December 2011, Crafton continued to provide investment advisory and business management services to those of his advisory clients he was able to retain following his termination from Investment Advisory Firm A.

### Crafton Received Undisclosed Compensation Related to Securities Investments Recommended to Clients

13. From approximately 2006 through at least 2010, Crafton received over $950,000 in undisclosed compensation from the principals of, and entities associated with, certain illiquid private investments that Crafton recommended to his advisory clients. Crafton received the undisclosed compensation in the form of brokerage commissions, cash, and securities.

14. From at least 2006 through at least 2008, Crafton recommended to his advisory clients that they invest in a private investment fund operating in Southern

4

California ("Fund A"). Fund A offered securities in the form of investment contracts, and was purportedly in the business of making secured loans to real estate developers. Based on Crafton's recommendation, Crafton's advisory clients invested in total at least $10 million in Fund A through private offerings purportedly exempt from registration under the Securities Act.

15. Crafton received over $485,000 in undisclosed compensation in connection with recommending that his advisory clients invest in Fund A. Crafton's undisclosed compensation included: (i) $81,000 in undisclosed brokerage commissions; (ii) a $50,000 equity interest in Fund A gifted to Crafton by Fund A's principal; and (iii) $354,000 in shares of a penny stock issuer gifted to Crafton by Fund A's principal.

16. From approximately 2006 through 2010, Crafton recommended to his advisory clients that they invest in the Westmoore Lending Opportunity Fund, LLC and Westmoore Investment, L.P. (collectively the "Westmoore Funds"), two presently defunct private funds whose principal place of business was in Anaheim Hills, California. The Westmoore Funds offered securities in the form of investment contracts, and were purportedly in the business of making loans and investing in and operating various businesses. Crafton also recommended that his clients invest in notes offered by certain Westmoore entities (the "Westmoore Notes"). The Westmoore Notes were securities in the form of notes or investment contracts. During the relevant period, Principal A was the principal of the Westmoore Funds and the entities associated with the Westmoore Notes. Based on Crafton's recommendation, Crafton's advisory clients invested in total at least $22 million in the Westmoore Funds and Westmoore Notes.

17. In connection with recommending the Westmoore Funds and Westmoore Notes to his advisory clients, Crafton received over $466,000 in undisclosed compensation, including over $295,000 in undisclosed brokerage commissions and $170,484 in direct payments from Principal A.

5

18.     The brokerage commissions associated with Crafton's clients' investments in Fund A, the Westmoore Funds, and the Westmoore Notes were made pursuant to a secret arrangement whereby commissions were surreptitiously funneled to Crafton through one of Crafton's employees ("Employee A"), who from 2006 through 2009 was employed as Martin Kelly Capital's Chief Compliance Officer and, simultaneously, served as a registered representative of Westmoore Securities, Inc. ("Westmoore Securities"). Westmoore Securities paid Employee A brokerage commissions calculated based on Crafton's clients' initial investments in Fund A, the Westmoore Funds, and the Westmoore Notes (which ranged from 1.8% to 4.5% of the amount invested), as well as trailer commissions paid later based on Crafton's clients' total amounts invested in those respective vehicles. In accordance with their secret arrangement, Employee A deposited all relevant brokerage commissions to Crafton's wholly-owned, private corporation, Redhawk Capital Management, Inc. ("Redhawk"), a California corporation with its principal place of business in San Diego, California.

19.     At all times during the relevant period, Crafton, while acting as an investment adviser, knew or was reckless in not knowing that he was receiving the undisclosed brokerage commissions, cash payments, and gifted securities from the principals of, and entities associated with, Fund A, the Westmoore Funds, and the Westmoore Notes, and that the compensation was related to and occurred during the period in which he was advising his clients to invest in Fund A, the Westmoore Funds, and the Westmoore Notes.

20.     At all times during the relevant period, Crafton, while acting as an investment advisor, intentionally, knowingly, or recklessly failed to disclose or intentionally and falsely denied to his advisory clients the fact that he was receiving compensation in connection with his advising clients as to the advisability of investments in Fund A, the Westmoore Funds, and the Westmoore Notes.

## Crafton Received Undisclosed Compensation Related to Mortgage Brokerage and Life Insurance Services Recommended to His Clients

21. From approximately 2007 through 2011, Crafton, while acting as an investment adviser, received over $554,000 in undisclosed compensation from a mortgage broker and a life insurance agent whom Crafton recommended to his advisory clients. Crafton received the undisclosed compensation in the form of cash payments to his corporate entity, Redhawk, as well as payments to Crafton's creditors.

22. From approximately 2007 through 2009, while acting as an investment adviser, Crafton recommended to his advisory clients the products and services offered by a certain mortgage broker operating in California ("Mortgage Broker A"). Unbeknownst to his clients, Crafton had a referral fee agreement with Mortgage Broker A whereby Crafton would receive 25% of all commissions earned by Mortgage Broker A on transactions by Crafton's advisory clients.

23. During the relevant period, Crafton received over $228,000 in undisclosed referral fees in connection with recommending Mortgage Broker A to his clients.

24. From approximately 2010 through 2011, while acting as an investment adviser, Crafton recommended to his advisory clients the services of a certain life insurance agent operating in Washington state ("Life Insurance Agent A") for purchasing life insurance products. Based on Crafton's recommendations, Crafton's clients purchased from Life Insurance Agent A life insurance products with aggregate policy amounts exceeding $80 million. Crafton's clients made premium payments on these policies exceeding $2 million. Life Insurance Agent A received over $690,000 in commissions based on these premium payments.

///
///
///

25. Crafton received over $326,000 in undisclosed compensation from Life Insurance Agent A in connection with Crafton's recommending to his advisory clients that they purchase life insurance products offered by Life Insurance Agent A.

26. At all times during the relevant period, Crafton, while acting as an investment advisor, knew or was reckless in not knowing that he was receiving compensation from Mortgage Broker A and Life Insurance Agent A, and that the compensation was in connection with the products and services offered by Mortgage Broker A and Life Insurance Agent A to Crafton's advisory clients.

27. At all times during the relevant period, Crafton, while acting as an investment advisor, intentionally, knowingly, or recklessly failed to disclose to his advisory clients the fact that he was receiving compensation in connection with their purchasing mortgage and life insurance products and services from Mortgage Broker A and Life Insurance Agent A, respectively.

### Crafton Misappropriated $700,000 in Client Funds

28. In June 2010, Crafton knowingly and intentionally orchestrated a fraudulent scheme whereby he directed the misappropriation of a total of $700,000 from two of his advisory clients for the benefit of a third advisory client.

29. From approximately 2006 through 2010, Crafton recommended to his clients that they invest in the Westmoore Funds and Westmoore Notes. Based on Crafton's advice Client A, a professional athlete, invested a total of $700,000 in Westmoore between approximately 2006 and 2008.

30. In early 2009, Crafton had become aware that the Westmoore Funds and Westmoore Notes could no longer make monthly distribution payments to investors or honor investors' redemption requests due to Westmoore's deteriorating financial condition.

31. In approximately spring 2010, Client A requested that Crafton liquidate and redeem Client A's entire $700,000 investment in the Westmoore

Funds and Westmoore Notes as part of Client A's decision to retain a different financial adviser. Despite knowing of Westmoore's financial condition and failure to honor investors' redemption requests, Crafton promised to redeem Client A's investment within 90 days. During the ensuing 90 day period, Client A continued to demand that Crafton liquidate his Westmoore investment.

32. On June 16, 2010, the Commission filed an emergency action against Principal A and numerous Westmoore entities alleging that the Westmoore entities, including the Westmoore Funds, were a fraudulent Ponzi-like scheme. As a result of the emergency action, the Commission obtained an order freezing the assets of the Westmoore entity defendants, including the Westmoore Funds.

33. On June 17, 2010, Crafton learned of the Commission's emergency action against Principal A and the Westmoore entities, including the Commission's allegation that the Westmoore operation was a fraudulent Ponzi-like scheme and the order freezing Westmoore's assets.

34. On June 21, 2010, Crafton directed Employee A to cause two clients—Client B and Client C—to purchase Client A's $700,000 position in Westmoore (the "June Transaction"). Crafton instructed Employee A to forge Client B and Client C's signatures on wire authorization documents for transfers of $350,000 from their respective brokerage accounts to Client A's personal bank account. Employee A used Adobe Photoshop to cut-and-paste the signatures on the wire authorization forms submitted to Client B and Client C's brokerage account. Ultimately, the transactions were completed, and a total of $700,000 was deposited into Client A's personal bank account. At Crafton's direction, Client B and Client C were then each assigned half of Client A's $700,000 position in Westmoore.

35. In perpetrating the June Transaction, Crafton, while acting as an investment adviser and while associated with a registered investment adviser, knew or was reckless in not knowing the following: (i) Client B and Client C had not

consented to and were otherwise unaware of the June Transaction prior to, during, and for a period of time subsequent to Crafton's effecting the transaction; (ii) Client B and Client C had not consented to and were otherwise unaware of the wire transfers or the use of their signatures to effect the June Transaction; (iii) Client B and Client C would not have consented to the June Transaction had they known of its existence; (iv) Crafton failed to disclose to Client B and Client C the existence of the June Transaction prior to, during, and for a period of time subsequent to Crafton effecting the transaction; and (v) Crafton failed to disclose to Client B or Client C that, only days prior to the June Transaction, the Commission had sued Principal A and numerous Westmoore entities alleging Westmoore was operating a fraudulent Ponzi-like scheme and that the Commission had already obtained a court order freezing Westmoore's assets, including the assets of the Westmoore Funds.

36. Client B and Client C each lost their $350,000 investment in Westmoore as a result of the June Transaction.

37. At all times during the relevant period, Crafton: (i) advised his clients concerning the advisability of investing in, purchasing, or selling securities, including Fund A, the Westmoore Funds, and the Westmoore Notes; and (ii) charged his investment advisory clients a fee based on a percentage of assets under management, charged his clients particularized fees for his advisory services, or otherwise received compensation for his advisory services.

38. At all times during the relevant period, Crafton was engaged in the business of effecting transactions in securities for the account of others, including Crafton's clients' transactions in Fund A, the Westmoore Funds, and the Westmoore Notes, by, among other things: (i) helping issuers identify potential purchasers of securities; (ii) soliciting his advisory clients to engage in securities transactions; (iii) giving advice on the value or merits of securities; (iv) assisting his advisory clients in determining the amounts to invest in securities; (v)

executing or facilitating the execution of securities transactions, including personally providing and submitting client investment documentation; (vi) executing client trades through an institutional brokerage account; (vii) directly handling advisory client funds, including having direct access to client bank accounts; and (viii) and preparing and sending transaction confirmations on behalf of his advisory clients, including wire transfer confirmations and securities trade confirmations.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

39. The Commission realleges and incorporates by reference paragraphs 1 through 38 above.

40. Crafton, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    (a)    acting with scienter, employed devices, schemes, or artifices to defraud;

    (b)    obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

41. By engaging in the conduct described above, Crafton violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

///
///
///

## SECOND CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

42. The Commission realleges and incorporates by reference paragraphs 1 through 38 above.

43. Crafton, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

44. By engaging in the conduct described above, Crafton violated, and unless restrained and enjoined will likely continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

**Violations of Sections 206(1), 206(2), and 206(3) of the Advisers Act**

45. The Commission realleges and incorporates by reference paragraphs 1 through 38 above.

46. At all relevant times, Crafton operated as an investment adviser as defined by Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b2(a)(11)], and served in that capacity with respect to his clients and investors.

47. Crafton, by engaging in the acts and conduct described above, directly or indirectly, through the use of the means or instruments of transportation or

communication in interstate commerce or of the mails, while engaged in the business of advising others for compensation as to the advisability of investing in, purchasing, or selling securities:

    (a)    with scienter employed devices, schemes, and artifices to defraud clients or prospective clients; or

    (b)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients.

    (c)    while acting as principal for his own account, knowingly sold any security to or purchased any security from a client, or acting as a broker for a person other than such client, knowingly effected a sale or purchase of securities for the account of such client, without first disclosing to such client in writing, before the completion of such transaction, the capacity in which he was acting and obtaining the consent of the client to each such transaction.

48. By engaging in the conduct described above, Crafton violated, and unless restrained and enjoined will continue to violate, Sections 206(1), 206(2), and 206(3) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(3)].

### FOURTH CLAIM FOR RELIEF

**Violations of Section 15(a) of the Exchange Act**

49. The Commission realleges and incorporates by reference paragraphs 1 through 38 above.

50. Crafton, by engaging in the acts and conduct described above, directly or indirectly, singularly or in concert, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or induce or attempt to induce, the purchase or sale of securities, without registering with the Commission as a broker or dealer.

///

51.     By engaging in the conduct described above, Crafton violated, and unless restrained and enjoined will continue to violate Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(l)].

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Securities and Exchange Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Crafton committed the alleged violations described hereinabove.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Crafton and his agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1)-(3) of the Advisers Act [15 U.S.C. § 80b-6(1)-6(3)].

### III.

Order Crafton to disgorge all ill-gotten gains, including prejudgment interest, resulting from the illegal acts or courses of conduct alleged in this Complaint.

### IV.

Order Crafton to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9].

///

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: December 10, 2014           Respectfully submitted,

*/s/ J. Lee Buck, II*
J. Lee Buck, II, D.C. Bar No. 421878
Stephen L. Cohen
Alfred C. Tierney
John P. Lucas
Attorneys for Plaintiff
Securities and Exchange Commission